# EXHIBIT 1

**BEFORE THE JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATION**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
IN RE TREMONT GROUP HOLDINGS, INC.          :
SECURITIES LITIGATION                       :    MDL No. 2052
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## NOTICE OF TAG-ALONG ACTION

Pursuant to Rules 7.4 and 7.5 of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation, Tremont Group Holdings, Inc. and Tremont Partners, Inc. (collectively,

"Tremont"), through their undersigned attorneys, hereby notify the Clerk of the Judicial Panel on

Multidistrict Litigation (the "Panel") of a potential "tag-along action," recently filed in the United

States District Court for the Middle District of Louisiana styled Municipal Employees

Retirement System of Louisiana v. Tremont Group Holdings, Inc., No. 3:09-cv-01008 (the

"Municipal Employees Action"). A copy of the complaint filed in the Municipal Employees

Action is attached hereto as Exhibit A. Defendants further state as follows:

On March 19, 2009, Tremont filed a motion with the Panel pursuant to 28 U.S.C.

§ 1407 to centralize fifteen actions (the "Actions") for consolidation and/or coordination for

pretrial purposes in the United States District Court for the Southern District of New York. The

complaints in each of the Actions arise out of each plaintiff's investments -- directly or indirectly

**EXHIBIT**

tabbies®

1

-- in Tremont-managed hedge funds which invested fund assets with Bernard L. Madoff and his company, Bernard L. Madoff Investment Securities LLC ("BLMIS"). Through the various complaints filed, the named plaintiffs seek to hold Tremont (and others) liable for, among other things, failing to detect Madoff's Ponzi scheme. On June 11, 2009, the Panel granted Tremont's motion.

On November 25, 2009, the Municipal Employees Action was filed in the United States District Court for the Middle District of Louisiana and is currently pending there.

The Municipal Employees Action is a potential "tag-along" action within the meaning of Rules 1.1, 7.4 and 7.5 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation as it involves common questions of fact with the Actions. Indeed, the Municipal Employees Action arises out of the massive fraud committed by Madoff and the subsequent collapse of BLMIS and the Municipal Employees plaintiff – like each of the plaintiffs in the Actions transferred by the Panel – alleges that Tremont, among other things, (i) made fraudulent misrepresentations and omissions in the its fund offering materials, (ii) failed to conduct adequate due diligence on Madoff before investing assets of the fund with BMIS, (iii) did not adequately monitor the fund's investment performance, and (iv) ignored information about Madoff purportedly demonstrating that investments with Madoff were unacceptably risky.

2

In light of the foregoing, Tremont respectfully request that the Panel enter an

order conditionally transferring the Municipal Employees Action to the Southern District of New

York.

Dated: New York, New York
       December 3, 2009

                    Respectfully submitted,

                    SKADDEN, ARPS, SLATE,
                      MEAGHER & FLOM LLP

By: _____
                    Seth M. Schwartz
                    Susan L. Saltzstein
                    Michael H. Gruenglas
                    William F. Clarke, Jr.
                    Four Times Square
                    New York, New York  10036-6522
                    (212) 735-3000

                    Attorneys for Tremont Group Holdings, Inc.
                    and Tremont Partners, Inc.,

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| MUNICIPAL EMPLOYEES RETIREMENT SYSTEM OF LOUISIANA INDIVIDUALLY AND, IN THE ALTERNATIVE, DERIVATIVELY ON BEHALF OF RYE SELECT BROAD MARKET FUND, L.P. | § § § § § § § | No. _____ |
| Plaintiff, | § | |
| | § | |
| vs. | § | **COMPLAINT** |
| | § | |
| TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., OPPENHEIMER | § § | _____ |
| ACQUISITION CORPORATION, and KPMG LLP | | **JURY TRIAL DEMANDED** |
| Defendants; | | _____ |
| AND RYE SELECT BROAD MARKET FUND, L.P. | | |
| Nominal Derivative Defendant. | | |

Plaintiff, Municipal Employees Retirement System of Louisiana, appearing herein through its undersigned attorneys, respectfully represents:

## PARTIES

### The Plaintiff

1.     Plaintiff, Municipal Employees Retirement System of Louisiana is a public retirement system organized under the laws of the State of Louisiana, with its principal place of business in Baton Rouge, Louisiana.

### The Madoff and Madoff Securities Non-Parties

2.     Bernard L. Madoff (Madoff) is the founder and owner of Bernard L. Madoff Securities, LLC (Madoff Securities).

1                                                           888197.8

3.     Non-Party Madoff Securities is a securities broker-dealer and investment advisor registered with the United States Securities and Exchange Commission (SEC), with its principal office in New York, New York.  Madoff Securities purportedly engaged in investment advisory services, market making, proprietary trading, and served as custodian of the Rye Select Broad Market Fund, L.P.'s (Fund) purported assets.

4.     Non-party Friehling & Horowitz, C.P.A. P. C. (F&H) is an accounting firm that operated out of a 238-square foot storefront office in Rockland County, New York. F&H had only three employees, one of whom was 80 years old and lived in Florida.  Upon information and belief, David Friehling (Friehling), F&H's only active accountant, has reported to the AICPA that he does not conduct audits.  F&H was engaged by Madoff and Madoff Securities to perform professional services, including auditing Madoff Securities' financial statements for 2002 through 2007.   On March 18, 2009, Friehling was charged in a six-count criminal complaint that accused him of securities fraud, aiding and abetting investment advisory fraud, and making false filings to the SEC in connection with his false certification that he had audited Madoff Securities' financial statements in accordance with generally accepted auditing standards (GAAS).  On November 3, 2009, Friehling pleaded guilty to the charges against him, including three counts of obstructing the administration of the federal tax laws, one count each of securities fraud and investment adviser fraud and four counts of making false filings to the SEC.  Friehling admitted that he had never adequately audited the Madoff operation and, as an investor in the scheme, had never been a truly independent auditor.  Friehling and F&H also have been named as defendants in a related civil lawsuit filed by the New York regional office of the SEC on the same day, alleging that F&H's audits of Madoff Securities were a sham.

## The Defendants

### *The Rye Funds*

5.    Rye Select Broad Market Fund, LP (Fund) is a limited partnership organized under the laws of the State of Delaware. It is a nominal defendant to the extent Plaintiff is bringing these claims on a derivative basis. Its stated investment objective was to achieve long-term capital growth, through investments with managers and portfolio funds. The Fund's assets were managed by and custodied with Madoff and Madoff Securities.

### *The Tremont Defendants*

6.    Defendant Tremont Group Holdings, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 555 Theodore Fremd Avenue, Rye, New York 10580. Tremont Group Holdings, Inc. is a wholly owned subsidiary of defendant Oppenheimer Acquisition Corporation (Oppenheimer Acquisition). Rye Investment Management (RIM) is a division of Tremont Group Holdings, Inc. and not a separate entity. The actions or omissions of RIM are the actions or omissions of Tremont Group Holdings, Inc.

7.    Defendant Tremont Partners, Inc. (Tremont Partners, together with Tremont Group Holdings, Inc., the Tremont Defendants) is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 555 Theodore Fremd Avenue, Rye, New York 10580. Tremont Partners is the chief operating subsidiary of defendant Tremont Group Holdings, Inc. Tremont Partners serves as the general partner of the Fund.

### *The Oppenheimer Acquisition Defendant*

8.    Defendant Oppenheimer Acquisition is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

3

Oppenheimer Acquisition acquired defendant Tremont Group Holdings, Inc. in 2001. Annual revenue of approximately $100 million from the Tremont Defendants comprised, at one time, approximately 7% of Oppenheimer Acquisition's annual revenue.

### The Auditor Defendant

9.    Defendant KPMG LLP (KPMG) is a limited liability partnership organized under the laws of the State of Delaware, with its principal place of business in New York, New York. KPMG sent to the Fund and to limited partners of the Fund (including the Plaintiff) unqualified audit opinions on the Fund's 2006 and 2007 financial statements. The returns of the Fund, as reported in these financial statements audited by KPMG, were purportedly derived from the investment strategy, that the Tremont Defendants represented, Madoff and Madoff Securities-employed.

## NATURE OF THE ACTION

10.    Plaintiff invested $5 million in the Fund and, with purported earnings, lost more than $6 million in the Fund. The Fund was marketed, sold and managed by the Tremont Defendants. Oppenheimer Acquisition is the parent of Tremont Group Holdings, Inc., and, at all times relevant, provided legal, compliance, and other support to the Tremont Defendants.

11.    The Fund became a single-manager investment vehicle. The Tremont Defendants served as investment manager to the Fund, but delegated all investment decisions to Madoff and/or Madoff Securities. Madoff, through Madoff Securities, purportedly executed all trades on behalf of the Fund, and also was the custodian for its securities.

12.    Plaintiff invested in the Fund because the Tremont Defendants by, among other things, offering materials, limited partnership agreements, [responses to due diligence

4

888197.8

questionnaires (DDQs)], and direct conversations - gave their assurance that they were intimately familiar with Madoff's and Madoff Securities' operations, and that they closely monitored Madoff's and Madoff Securities' transactions, internal controls, and operational risk  Moreover, the Tremont Defendants through, among other things, periodic performance reports and yearly financial statements, and direct conversations - also represented that the assets Madoff and Madoff Securities claimed to hold for the Fund existed and were appreciating, and that the trades Madoff and Madoff Securities claimed to have made for the Fund actually occurred.

13.    The Tremont Defendants thus purposefully positioned themselves as the portal for all Madoff-related information, and, in exchange for the substantial "management" fees they charged the Fund, promised that they had sufficiently vetted and monitored Madoff and Madoff Securities and would continue to do so.  Plaintiff relied on these representations in making and retaining its investment in the Fund, in particular because the Tremont Defendants acted as sole sources of information regarding the Fund, Madoff and Madoff Securities resulting in Plaintiff and the Fund having little or no direct access to Madoff and Madoff Securities.

14.    In fact, it now appears that Madoff, who pled guilty on March 12, 2009, to all eleven counts in the criminal information prosecutors filed against him, misappropriated the funds he received and purportedly invested for the Fund's benefit.  In December 2008, it was revealed for the first time that Madoff had for years been running a massive Ponzi scheme, and that the "investments" he purportedly managed held little or no real assets.  As part of his plea allocution, Madoff admitted to perpetrating this fraud since at least the early 1990s (prosecutors charge the fraud began at least as early as the 1980s), and admitted that he never invested his

5                                            888197.8

investment advisory clients' assets in securities. Instead, he simply deposited client funds in an account at Chase Manhattan Bank, and paid redemptions from that account.

15.    If the Tremont Defendants actually had conducted the due diligence and monitoring they claimed they had, they would have been aware of these now obvious facts. The Tremont Defendants either failed to perform the due diligence or monitoring they claimed to have performed, did so negligently, or they uncovered evidence of Madoff's Ponzi scheme, and negligently failed to advise Plaintiff's representatives that the Fund's assets did not exist and were not appreciating -- with the result that the Tremont Defendants' continued to collect substantial fees from the Fund.

16.    In addition to the representations of the Tremont Defendants, Plaintiff also relied upon unqualified audit opinions sent to it by KPMG. Because the Fund relied on Madoff and Madoff Securities for virtually all portfolio management, trade execution, and custodial services, GAAS required KPMG to obtain sufficient, appropriate audit evidence to support the existence of the assets Madoff and Madoff Securities claimed to hold and invest for the benefit of the Fund, and to support the occurrence of the purported trades that generated the income reported in the Fund's financial statements.

17.    Given the concentration of functions at Madoff Securities, and the resulting need for heightened professional skepticism, KPMG should have determined whether a reputable auditor conducted adequate procedures to satisfy itself as to the effectiveness of Madoff Securities' internal controls, and as to the existence of assets and the occurrence of trades.

18.    Madoff Securities' auditor, F&H, failed to perform such procedures, and its reputation and the inadequacy of its work made its reports unreliable. F&H was a three person

6                                                          888197.8

firm, with only one active accountant, Friehling, who worked out of a small storefront office, had not been "peer-reviewed", and who reported to the American Institute of Certified Public Accountants (AICPA) that he did not conduct audits. Moreover, as alleged by the SEC in its complaint against Friehling and F&H, and as KPMG would have discovered if it had asked to review F&H's work papers, F&H's audits of Madoff Securities were a sham, and not supported by any meaningful documentation. Thus F&H's "audit" work on Madoff Securities was unreliable.

19.     Without assurance from a reputable auditor as to the existence of the assets and occurrence of trades, KPMG itself should have obtained additional audit evidence either by insisting that Madoff Securities engage a reputable auditor, or by performing audit procedures itself. At the very least, KPMG owed a duty to the Fund to advise the Fund's investors, including Plaintiff, of this suspect and unreliable source of audit information. No evidence has been reported to suggest that KPMG obtained such appropriate audit evidence. Moreover, because neither Madoff nor Madoff Securities held any of the assets they claimed to hold for investment advisory clients, and made none of the supposed trades, KPMG would not have been able to obtain corroboration from sources independent of Madoff Securities that the assets existed or trades occurred.

20.     Under these circumstances, KPMG knew, should have known, or was negligent in not knowing that issuing unqualified audit opinions on the financial statements of the Fund would violate GAAS. Nevertheless, KPMG sent to the Fund and to Plaintiff unqualified audit opinions for the Fund. These audit opinions were false and misleading, and their issuance by KPMG was negligent. KPMG knew that investors in the Fund would rely on its audit opinions

7                                                  888197.8

relative to the Fund, which purportedly derived returns from the same investment strategy the Tremont Defendants claimed Madoff and Madoff Securities employed. Had KPMG issued anything other than an unqualified audit opinion with respect to the Fund, Plaintiff would not have invested in the Fund, or, if invested, immediately would have redeemed any existing investments.

21.    As a result of the wrongful conduct described herein, Plaintiff lost more than $6 million, for which the defendants are liable *in solido*.

22.    Plaintiff brings this action derivatively in the right and for the benefit of the Fund to redress the injuries suffered, and to be suffered, by the Fund as a direct result of the violation of state and federal securities laws, breach of fiduciary duties, abuse of control, gross mismanagement, breach of contract, unfair trade practices, reckless disregard and negligence alleged herein. The Fund is named as Nominal Defendant solely in a derivative capacity.

23.    Plaintiff is a limited partner of the Fund and was a limited partner of the Fund at all times relevant to the Tremont Defendants' wrongful course of conduct alleged herein.

24.    Defendant Tremont Partners, Inc. is, and was during all relevant times, the Fund's general partner.

25.    Plaintiff has not made demand upon the Tremont Defendants to bring action on behalf of the Fund to assert the claims herein in order to recover damages for the injuries suffered by the Fund, because such a demand would have been a futile, wasteful and useless act, and is therefore excused.

26.    A demand by Plaintiff for the Tremont Partners to bring suit against itself and the other Tremont Defendants would be futile. Tremont Partners was vested with ultimate authority

8                                888197.8

in managing the investments of the partnership.  As such, it faces substantial liability as a result of its gross misconduct and breach of duties.  Tremont Partners and the other Tremont Defendants' acts and omissions discussed herein rise to the level of gross misconduct and bad faith and are not protected by the business judgment rule.

28.     Tremont Partners cannot make an independent and disinterested decision were it to receive a demand.  Tremont Partners would be required to choose whether to file suit against itself and the other Tremont Defendants in order to recover damages caused by the Tremont Defendants and to recover fees received by the Tremont Defendants, as a result of the misconduct.

28.     Further, any demand that Tremont Partners, Inc. bring suit against KPMG would also be futile because KPMG, the Tremont Defendants and Tremont Partners all face liability for similar misconduct.  Additionally, the claims brought against KPMG require discovery into the information received by KPMG from various sources, including the Tremont Defendants.

29.     For these reasons, among others, any demand by Plaintiff that the Tremont Defendants bring the claims set forth herein would be futile.

30.     The Fund has been directly and substantially injured by reason of the Tremont Defendants' intentional breach, negligence and/or reckless disregard of its fiduciary duties to the Fund.  Plaintiff, as a limited partner of the Fund, seeks damages, return of all fees and other relief for the Fund, in an amount to be proven at trial.

### PLAINTIFFS' LOSSES

31.     Plaintiff invested $5,000,000.00 in the Fund on May 1, 2006.

888197.8

32.    On January 14, 2009, Rye Investment Management (RIM), a division of Tremont Group Holdings, Inc. that managed, sold, and administered the Tremont Defendant's platform of single-manager funds, told partners in the Fund on behalf of the Tremont Defendants that it had concluded that this and related funds had "lost substantially all of their value," and that these funds as of November 30, 2008, "reflect a total loss of assets which were held at Madoff Securities."

33.    Plaintiff has lost 100% of its investment in the Fund.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

34.    This Court has original and/or supplemental subject matter jurisdiction over all claims in this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1367. Some of the claims asserted herein arise under the federal securities laws, and the state-law claims are so related to the federal claims as to form part of the same case or controversy.

35.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332, and the matter in controversy exceeds $75,000.00.

### Personal Jurisdiction

36.    Each of the defendants has subjected itself to the personal jurisdiction of this Court by way of their directed and purposeful transaction of business within the State of Louisiana; dissemination to Plaintiff's representatives of offering materials, financial disclosures, audit reports, limited partnership agreements and/or other written materials from and/or in the State of Louisiana; and communications with Plaintiff to, from, and/or in the State of Louisiana.

10                                        888197.8

In addition, KPMG has offices in the State of Louisiana and generally transacts business within the State of Louisiana.

**Venue**

37.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391, because a substantial part of the events and omissions, insofar as Plaintiff is concerned, giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

**The Tremont Defendants**

38.     Madoff founded and ran Madoff Securities, an SEC-registered broker-dealer. Madoff and Madoff Securities also purported to provide investment advisory services. Madoff Securities acted as prime broker and custodian for the assets Madoff claimed to manage for his investment advisory clients. Madoff limited the number of investors he would deal with directly, but accepted investments from funds sold by the Tremont Defendants. The Tremont Defendants marketed their single-manager funds to investors as a means to access Madoff's investment advisory services.

39.     The Tremont Defendants consistently represented - through, among other things, offering materials, a limited partnership agreement, financial disclosures, DDQs, and direct conversations - that they had conducted sufficient due diligence on Madoff and Madoff Securities to verify, among other things, the existence of the assets Madoff and Madoff Securities claimed to hold and manage for the Tremont Defendant's investors, and the occurrence of the trades that Madoff and Madoff Securities claimed to execute on those investors' behalf.

11                                                                    888197.8

40.    The Tremont Defendants' relationship with Plaintiff commenced in 2006, when Plaintiff first invested in the Fund (then in operation under a different name).[1]  This Fund's assets (other than cash balances) were purportedly managed by Madoff and custodied with Madoff Securities.    Plaintiff made this investment relying on the Tremont Defendant's representation of the historical performance of the Fund, Madoff and Madoff Securities and the numerous representations the Tremont Defendants made to Plaintiff's representatives about the due diligence the Tremont Defendants purportedly conducted on Madoff and Madoff Securities.

41.    The Tremont Defendants represented in, among other things, offering materials, a limited partnership agreement, DDQs, and direct conversations that they had conducted extensive due diligence on Madoff and Madoff Securities, and were monitoring Madoff and Madoff Securities.    The Tremont Defendants also claimed to have a comprehensive understanding of Madoff Securities' operations. This understanding was particularly important to Plaintiff because the Tremont Defendants controlled and limited Plaintiff's access to Madoff and Madoff Securities, and positioned and described themselves as the organization that would work with Madoff and Madoff Securities to provide continuing information to Plaintiff including responses to all information requests made by Plaintiff.

42.    The Tremont Defendants kept the Fund and Plaintiff and their representatives isolated from and declined to facilitate any contact with Madoff or Madoff Securities. The Tremont Defendants emphasized that their role was, in part, to minimize the need for the Fund or

---

[1] This fund was called the American Masters Broad Market Fund, LP. The fund's name was changed on July 2006, to the Rye Select Broad Market Fund, LP.

12                                      888197.8

Plaintiff to have direct contact with Madoff or Madoff Securities. Doing so, the Tremont Defendants explained, avoided "disturbing" Madoff.

43.    The aforementioned representations were made by the Tremont Defendants prior to and after Plaintiff's investment in the Fund.

### The 2006 SEC Form ADV

44.    Plaintiff received the Tremont Partners Form ADV dated March 31, 2006. Tremont Partners represented in this Form ADV that it "is engaged on a daily basis with custodians and/or trustees to monitor cash flow and fund compliance"; that "[f]und accounts are monitored in terms of securities holdings, asset mix and adherence to investment guidelines"; and that Tremont Partners "uses its own proprietary software programs to monitor the performance of investment managers."

45.    The Form ADV also provided that Tremont Partners "makes recommendations and/or selections of underlying investment managers" and in doing so, Tremont Partners' "research staff evaluates investment management organizations" and "analyzes, in detail, the philosophy, styles, strategies, investment professionals, decision-making processes and performance of the organization and the investment products offered. [Tremont Partners'] research staff conducts on-site interviews at and examination of such organizations to evaluate back office operations and internal staff, among other things."

46.    In the Form ADV, Oppenheimer Acquisition Corp. is listed as a "control person" of Tremont Partners based on its indirect ownership of Tremont Partners, Inc. and direct ownership of Tremont Group Holdings, Inc. (f/k/a Tremont Capital Management, Inc.).

13                                888197.8

***The Fund's Offering Materials***

47.    On or about July 2006, the Tremont Defendants renamed some of their funds the "Rye Select Funds," including the Fund.

48.    The Tremont Defendants again promoted the Fund as designed to achieve long term capital growth through the use of an investment advisor who invests in equity securities and, to a lesser extent, other securities.

49.    The Fund's Second Amended and Restated Limited Partnership Agreement (Limited Partnership Agreement), dated January 1, 2005, and provided by the Tremont Defendants stated that the "management, operation and control of the business of the Partnership shall be vested completely and exclusively in" Tremont Partners.

50.    The Limited Partnership Agreement empowered and obligated Tremont Partners to carry out the investment objectives and the business of the Partnership and required Tremont Partners to "devote such time as it shall determine to be necessary for the efficient conduct of the Partnership's business." Under the Limited Partnership Agreement, Tremont Partners had "the right, power and authority, on behalf of the Partnership and in its name, to exercise all rights, powers and authority of a general partner," including the power to "execute, amend, supplement, acknowledge and deliver any and all contracts, agreements or other instruments, including, but not limited to, contracts with one or more Investment Advisors, banks, trust companies or administrators for the performance of services to the Partnership, including the investment and reinvestment of all or part of the Partnership's assets, the execution of portfolio transactions and the performance of any or all administrative functions."

51.     The Fund's private placement memorandum (PPM), dated September 15, 2005, identified Tremont Partners as the general partner, exercising "ultimate authority over the Partnership," and stated that Tremont Partners was "responsible for managing the day-to-day operations and investment management of the Partnership." The PPM also states that Tremont Partners "has primary responsibility for monitoring the ongoing activities of the Investment Advisor or Investment Advisors. [Tremont Partners] reviews the confirmation of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts." Further, Tremont Partners "has sole responsibility for contacting the Investment Advisor or Investment Advisors regarding trading activity, as well as the sole right to hire or terminate the Investment Advisor or Investment Advisors."

52.     The PPM provides that "Tremont Partners will review the Partnership's holdings with the Investment Advisor or Investment Advisors not less frequently than quarterly to assess, among other things, their investment performance and to determine whether they continue to meet the general investment criteria outlined above." The PPM also requires Tremont Partners to "request detailed information on a continuing basis from each Manager regarding the Manager's historical performance and investment strategies."

53.     Both the offering materials and partnership agreement acknowledged Tremont Partners' fiduciary responsibilities and potential liability to the Fund's limited partners, who include the Plaintiff.

54.     The PPM for the Fund identified their investment objective as "to seek long term capital growth." The Fund purportedly sought to accomplish this investment objective by

investing with a "Manager who is based in the U.S. and who invests or trades in a wide range of equity securities and, to a lesser extent, other securities" - i.e., Madoff and Madoff Securities.

55.    In other materials relating to the Fund disseminated by the Tremont Defendants, and received by the Plaintiff, the Tremont Defendants represented that the investment advisor [Madoff] utilizes a 'split-strike conversion' investment strategy. This strategy, according to the Tremont Defendants "consists of: (i) purchasing equity shares, (ii) selling related out-of-the-money call options which represent a number of underlying shares equal to the number of shares purchased, and, (iii) buying related out-of-the-money or at-the-money put options representing the same number of underlying shares. Plaintiff invested in the fund with the understanding that this strategy would be employed by Tremont and the investment advisor [Madoff].

56.    In fact, contrary to the representations of the Tremont Defendants, Madoff never actually employed this strategy in regards to the Fund's assets. Rather, Madoff fabricated these transactions. The Tremont Defendants had an obligation to verify and confirm that this strategy was indeed used by Madoff when investing the Fund's assets. The Tremont Defendants completely failed, due to either reckless disregard or misfeasance, to ensure that the split-strike conversion strategy was actually utilized by Madoff.

### *Financial Disclosures*

57.    In addition to the communications described above, the Tremont Defendants sent to Plaintiff's representatives detailed documentary presentations throughout the duration of Plaintiff's investment in the Fund that purported to reflect the financial results of the Fund's investments.

58.    The financial disclosures the Tremont Defendants sent to Plaintiff's representatives included the 2006 financial statements for the Fund dated March 26, 2007; the 2007 financial statements for the Fund dated March 24, 2008. The Tremont Defendants also sent to Plaintiff's representatives quarterly account statements and monthly performance updates for the Fund.

59.    All of these financial disclosures represented that the Fund's assets existed and were consistently appreciating.

***Continued Investment in the Fund***

60.    In 2007, Plaintiff received the Rye Select Broad Market Prime Fund, L.P., Due Diligence Questionnaire dated July 1, 2007 ("Prime Fund DDQ"). The Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") was represented to Plaintiff as being an investment vehicle equivalent to the Fund with the primary difference being that the Fund was less leveraged, and therefore less risky, than the Prime Fund. Plaintiff relied on information from the Prime Fund DDQ in making its decision to continue its investment in the Fund.

61.    The Prime Fund DDQ indicates that, with respect to fund such as the Prime Fund and the Fund, "Tremont Partners has overall responsibility for implementing the investment strategies and the authority to select investment Advisors as discretionary asset managers." Further, Tremont Partners manages the Prime Fund's "liquidity and has full control over the [Prime] Fund's brokerage account."

62.    The Prime Fund DDQ also indicates that Tremont Partners "maintains a close relationship with the Investment Advisor and has regularly visited with the investment advisor's

operation. Tremont's dedicated operational risk management professionals have also carried out their standard hedge fund due diligence."

63.    Additionally, the Prime Fund DDQ states that Tremont Partners reviews each trade of the Prime Fund's brokerage account assets by the Investment Advisor "to ensure that the Investment Advisor does not deviate from the stated investment strategy."

64.    In addition to the Prime Fund DDQ, RIM sent investors in the Fund, including the Plaintiff, correspondence dated July 27, 2007, indicating that the funds under the RIM division of Tremont Group Holdings, Inc., which included the Fund, "experienced a successful 2nd quarter with highlights including positive returns from each of the Rye Select Funds...". The correspondence stated that the "adviser for the Rye Select Broad Market funds' portfolio managed through a volatile U.S. equity market to end the quarter in positive territory," noting that "the assets of the original Rye Select Broad Market Fund, L.P. surpassed $1B in May."

65.    In April of 2008, RIM sent investors in the Fund, including the Plaintiff, similar correspondence, indicating that "[a]gainst a headwind that witnessed the S&P 500 drop -6.0% in January and -9.4% through the end of March," the Rye Select Funds, including the Fund, "experienced an unwavering first quarter." Further, the correspondence represented that the Rye Select Broad Market funds, including the Fund, "continued their positive run as a particularly well timed trade in January captured a brief but substantial equity market rally during a month that was marked by endless headlines surrounding the credit crisis. Capacity remains limited in response to seemingly unlimited interest."

888197.8

*The Tremont Defendants' Representations Were Negligently False and Misleading*

66.     The representations by the Tremont Defendants described above, and others, were negligently false or made negligently without regard to truthfulness to the point of being reckless. They were also material and misleading. During the first week of December 2008, it was revealed that Madoff's and Madoff Securities' investment advisory operation was a massive fraud. Madoff reportedly told a senior employee that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." He reportedly explained that he had for years been paying returns to certain investors out of the principal received from other, different, investors; and that the business was insolvent and had been for years.

67.     On March 12, 2009, Madoff pled guilty to all eleven counts in the criminal information filed by the United States Attorney's Office, admitting that he perpetrated a fraud since the early 1990s (prosecutors charged that the fraud began in the early 1980s). In his plea allocution, Madoff admitted that he never invested his investment advisory clients' funds in securities, that he never employed the split-strike conversion strategy he (and the Tremont Defendants) touted, and that he never had custody of the securities he purportedly held for his investment advisory clients. Instead, Madoff and Madoff Securities merely deposited client funds into an account at Chase Manhattan Bank, and distributed money from this account to clients who requested redemptions.

68.     Madoff also admitted that he caused to be created and sent to his clients false trading confirmations and false client account statements that reflected bogus transactions and positions. Prosecutors charged that Madoff hired numerous employees with little or no prior

19                              888197.8

pertinent training or experience in the securities industry to perform these and other "back office" functions. Madoff admitted that he knew that the audited financial statements he filed with the SEC were false and misleading; Madoff Securities' accountant (F&H) was soon thereafter charged with fraud on March 18, 2009 and subsequently plead guilty.

69.     Madoff also described in his plea allocution how he wired money between Madoff Securities' bank accounts and the London bank account of Madoff Securities' United Kingdom affiliate Madoff Securities International Ltd. Prosecutors charged that these transfers were designed to give the appearance that he was conducting securities transactions in Europe.

70.     If the Tremont Defendants actually had conducted the due diligence and monitoring they were obligated to conduct and which they claimed to have conducted, they would have been aware of these facts. They would have realized that the assets Madoff Securities purportedly held and the trades Madoff Securities purportedly executed for the benefit of the Fund could not be corroborated from sources independent of Madoff and Madoff Securities.

71.     With such corroborating evidence, the Tremont Defendants never could have gained a sufficient basis to provide Plaintiff with false reports that purported to reflect positive returns on the Tremont Defendant's claimed active and effective oversight of Plaintiff's invested capital.

72.     The Tremont Defendants negligently failed to perform the due diligence or monitoring they claimed to have performed, or they uncovered evidence of Madoff's Ponzi scheme, and recklessly misrepresented to Plaintiff's representatives that the Fund's assets existed

and were appreciating - all in order to continue collecting substantial management fees from Plaintiff and other limited partners of the Fund.

## KPMG

73.    KPMG was engaged to perform audits of the financial statements of the Fund for the years 2005 through 2007. KPMG was specifically listed as the independent auditor of the Fund in the PPM. These audits were to be performed in accordance with United States GAAS. The unqualified or "clean" audit letters by KPMG were subsequently addressed to the "Partners" of the Fund. The delineation of KPMG as "independent auditor" was relied on by Plaintiff in making the investment.

### *GAAS Requirements*[2]

74.    GAAS required KPMG to exercise due professional care in the performance of its audits and the preparation of its reports. (AU §§ 150.02, 230.02.) Due professional care required KPMG to exercise professional skepticism, an attitude that includes a questioning mind and a critical assessment of audit evidence. (AU § 230.07.)

75.    GAAS required KPMG to obtain a sufficient understanding of the Fund and its environment, including its internal controls, in order to assess the risk of material misstatement of the Fund's financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. (AU § 150.02.)

---

[2] In early 2006, the Auditing Standards Board of the AICPA, which promulgates GAAS, issued several new Statements on Auditing Standards, primarily to emphasize the auditor's assessment of the risk of material misstatement of financial statements and the responses to such assessed risk. These standards became effective for audits of periods beginning after December 15, 2006, but auditors (like KPMG) could elect to apply these standards earlier. Sections of the prior codification, where different from the current section numbers, are cited here as "Old AU § xxx.xx."

888197.8

76.    As part of the process of obtaining an understanding of the Fund and its environment, KPMG was required to obtain an understanding of, among other things, the Fund's industry; nature; and the objectives, strategies, and related business risks that may result in a material misstatement of its financial statements.  This included obtaining an understanding of the Fund's operations, ownership, governance, structure, how it was financed, and the types of investments the Fund made.  (AU §§ 314.21, 314.26; Old AU §§ 311.06, 311.07.)

77.    As part of the process of obtaining an understanding of the Fund's internal controls, GAAS required KPMG to evaluate the design of its financial controls, and determine whether they had been implemented.  (AU § 314.40; Old AU §319.25.)  Additionally, if KPMG planned to rely on the internal controls of the Fund, GAAS required KPMG to determine that these controls were operating effectively.  (AU §§ 318.13, 318.23, 318.24, 318.45; Old AU § 319.66.)   "Internal control is a process - effected by those charged with governance, management, and other personnel - designed to provide reasonable assurance about the achievement of the entity's objectives with regard to reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations."  (AU §314.41; Old AU 319.06.)

78.    GAAS recognizes that an understanding of an entity and its environment, including its internal controls, does not provide by itself a sufficient basis for forming an opinion on an entity's financial statements.  Rather, GAAS requires the auditor to perform further audit procedures.  (AU § 150.02.)   Further audit procedures include "tests of controls" and/or "substantive procedures."

888197.8

79.     *Tests of controls* are used to "obtain audit evidence that controls operate effectively. This includes obtaining audit evidence about how controls were applied at relevant times during the period under audit, the consistency with which they were applied and by whom or by what means they were applied." (AU § 318.26; Old AU § 319.76.) *Substantive procedures* are performed to detect material misstatements and primarily include tests of details of balance sheet and income statement accounts, and of analytical procedures. (AU §318.50; Old AU § 319.108.)

80.     Because effective internal controls generally reduce, but do not eliminate, the risk of material misstatement, and because an auditor's assessment of risk is judgmental and may not be sufficiently precise to identify all risks of material misstatement, tests of controls reduce, but do not eliminate, the need for substantive procedures. (AU §§ 318.09, 318.51.) Therefore GAAS required KPMG to design and perform substantive procedures for the Fund's material balance sheet and income statement accounts - such as the Fund's investments and its investment income. More specifically, KPMG was required to test (i) the existence and valuation of the Fund's securities at every balance sheet date; (ii) the Fund's ownership of those securities; (iii) the occurrence and accuracy of the Fund's transactions in U. S. Treasury obligations, stocks, and options; and (iv) the reasonableness of the Fund's reported investment income. (AU §§ 318.09, 318.51, 326.15, 332.21-22, 332.25; Old AU §§ 319.107, 326.03 - 326.07.)

81.     Upon information and belief, KPMG knew that Tremont Partners (as general partner of the Fund) engaged Madoff and Madoff Securities to perform the functions of investment advisor, prime broker, and custodian of the Fund's investments.

23

888197.8

82.     This concentration of functions at Madoff Securities created risks requiring special audit consideration - what GAAS calls "significant risks" (AU § 314.110.) Because *all* of the Fund's investment and income information available to KPMG was based on information from Madoff Securities, KPMG needed to do more than rely *solely* on the procedures it performed with respect to the Fund.  (AU §§ 314.115, 318.53, 332.20.)[3]  In these circumstances, KPMG should have determined whether a reputable auditor conducted adequate procedures to satisfy itself as to the effectiveness of Madoff Securities' internal controls (AU §§ 332.18, 332.20), or as to the existence of assets and the occurrence of trades reported by Madoff Securities.

83.     Madoff Securities' auditor failed to perform such procedures.  GAAS required KPMG, to the extent it relied on any audit work performed by F&H,[4] to consider F&H's reputation and standing in the audit community.  (AU §§ 324.18, 543.10.)  F&H operated out of a small storefront office in Rockland County, New York, and consisted of one retiree in Florida (since deceased), an administrative assistant, and one active accountant who represented to the AICPA that he does not perform audit services.  Moreover, F&H had not been "peer reviewed," which posted increased risk and greater concern.

---

[3] Pursuant to the prior codification of auditing standards, GAAS required KPMG, upon identifying a risk of a material misstatement due to fraud, to develop an understanding of internal controls related thereto, evaluate the design of such controls, determine whether they have been placed in operation, and develop an appropriate audit response. (Old AU §§ 316.44, 316.48.)

[4] It is unclear whether KPMG received audit reports by F&H.  The SEC, in its complaint against Friehling and F&H, alleges that F&H prepared an "Independent Auditors' Report on Internal Control," and that Madoff Securities provided this report directly only to certain investors.

84.    These facts alone, easily discoverable by KPMG (AU §§ 324.18, 543.10(a) n.4), should have caused KPMG, if it intended to rely on F&H's audit work, to perform additional procedures to assess the adequacy of that work.

85.    Had KPMG reviewed F&H's work papers (*see* AU §§ 324.19, 543.12), it would have discovered that F&H's audits were a sham, and that it failed to document its purported findings and conclusions, as required by GAAS (AU § 339.10). As the SEC has alleged in its complaint against Friehling and F&H, F&H never conducted legitimate audits. Specifically, the SEC has alleged that F&H failed, among other things, to conduct any audit procedures with respect to Madoff Securities' internal controls, or to confirm that the securities Madoff Securities claimed to hold for its customers did, in fact, exist. Instead, the SEC alleges, F&H, among other things, conducted only physical inventory checks of securities that happened to be on hand, without verifying the existence of certificates purportedly held by outside clearing organizations or depositories.

86.    In view of this concentration of functions, the reputation and standing of F&H, and the inadequacy of F&H's work, KPMG should have obtained additional audit evidence relating to the effectiveness of the functions performed by Madoff Securities relevant to the Fund's reported investments and investment income. (AU § 332.18, 332.20.)

87.    For example, KPMG should have obtained additional audit evidence about the operating effectiveness of financial controls relating to initiation, recording, processing, and reporting of Madoff Securities' investment advisory clients' transactions (including those of the Fund), and those relating to the custody of Madoff Securities' investment advisory clients' investments (including those of the Fund). (AU §§ 318.25, 332.18, 332.20; Old AU §§ 319.65 -

25

319.74.) Furthermore, KPMG should have performed substantive procedures at Madoff Securities relating to the Fund's reported investments and investment income. (AU § 318.09, 318.51; Old AU § 319.107.) KPMG could have performed these procedures itself, or it could have relied on a report from a reputable auditor whose work was adequate to meet these audit objectives. (AU §§ 324.10, 324.12, 324.18-19, 543.10, 543.12.)

88.    For the reasons described below, KPMG could not have obtained sufficient audit evidence about the operating effectiveness of controls of Madoff Securities, or reasonably have satisfied itself about the existence of the investments and the reasonableness of the reported investment income except by performing substantive audit procedures. Nevertheless, it negligently, in reckless disregard of what it knew or should have known, issued unqualified "clean" audit opinions on the Fund's financial statements.

89.    In view of the unreliability of F&H's audit work, as described above, KPMG could not have issued unqualified audit opinions on the Fund's financial statements unless additional audit procedures were performed, the results of which reasonably satisfied KPMG that the reported securities existed and the reported investment income was reasonably stated. KPMG could have tried to obtain this satisfaction either by (i) having a reputable auditor engaged to perform adequate audit procedures, or (ii) performing these procedures itself. No evidence has been reported to date that suggests such procedures were performed by any auditor, including KPMG. Moreover, it is highly unlikely that Madoff would have allowed a reputable auditor to perform the procedures required by GAAS. If these required procedures could not be performed, then GAAS required that KPMG disclaim an opinion on the Fund's financial statements. (AU § 508.62.)

90.    If KPMG or another reputable firm *had* performed these required procedures, for the reasons described below doing so would have uncovered that the securities did not exist and trades did not occur.

91.    Because of the concentration of functions at Madoff Securities, the reputation and standing of F&H, and the inadequacy of F&H's work, the resulting need for heightened professional skepticism would have required that the procedures performed by KPMG or another reputable firm include seeking corroboration of the existence of the assets and the occurrence of trades from sources *independent of Madoff Securities*. (AU §§ 326.08, 326.11.) Any such attempts would have revealed the Madoff/Madoff Securities fraud.

92.    For example, Madoff and Madoff Securities claimed to hold all of its investment advisory clients' assets – purportedly billions of dollars – in U.S. Treasuries at the end of each reporting period. An auditor having access to Madoff Securities' books and records easily could have sought to corroborate the existence of these U.S. Treasuries – especially given the large amount reported – by requesting confirmations from the depository institutions or clearing institutions at which book entries for these assets should have existed. If Madoff and Madoff Securities actually held the U.S. Treasuries reported, these confirmations would have indicated U.S. Treasuries Madoff Securities held in the aggregate for all of its clients totaling in the multi-billions of dollars.

93.    However, no such confirmations were possible. As Madoff admitted in his plea allocution, Madoff and Madoff Securities held *no* investment advisory clients' assets in Treasuries, let alone *billions* of dollars worth. Rather, according to Madoff, Madoff Securities held only cash in an account at Chase Manhattan Bank, from which he operated his Ponzi

scheme. Accordingly, a confirmation from these depository institutions or clearing institutions would have shown only the U.S. Treasuries Madoff Securities held for the clients of its legitimate brokerage business – an amount, if anything, that in all likelihood would have been dwarfed by the billions of dollars Madoff Securities claimed to hold for its investment advisory clients. In other words, seeking such confirmations, which depository institutions routinely send, very likely would have immediately revealed Madoff's and Madoff Securities' fraud.

94.    KPMG also could have sought to corroborate Madoff's and Madoff Securities' purported purchases and sales of equities for the Fund by (a) instructing Madoff and Madoff Securities to request confirmation of these trades from depository or clearing organizations or counterparties to the trades, and (b) reconciling the trades to settlement reports from these organizations or counterparties. Such procedures would have revealed either that no such trades had occurred, or that the amounts were inconsistent with the trades that the Fund reported Madoff and Madoff Securities had made.

95.    With respect to the over-the-counter option trades Madoff and Madoff Securities claimed to make for their investment advisory clients, Madoff testified to the SEC on or about May 19, 2006, that the counterparties to his purported option contracts were "basically European banks," and that there is "an affirmation that's generated electronically" and an electronic "master option agreement" that is attached to the affirmation that documented these option trades. Madoff admitted in his plea allocution that these option trades never occurred. Thus, had an auditor sought to confirm this nonexistent documentation with these European bank (and any other) counterparties, the fraud would have been immediately revealed.

96.    By whatever means, any meaningful attempt at seeking corroboration of the existence of assets and occurrence of trades independent of Madoff Securities would have uncovered the fraud. Because KPMG issued unqualified audit opinions on the Fund's financial statements, it is clear that neither KPMG, nor any other reputable auditor at KPMG's request, ever attempted to obtain this independent corroboration.

97.    In sum, in these circumstances KPMG (i) could not rely on F&H's purported audit work on Madoff Securities, including any F&H reports on internal controls; and (ii) should have verified the existence of the assets and the occurrence of trades either by having a reputable auditor corroborate the reported assets and trades with sources independent of Madoff Securities, or by doing so itself. Accordingly, under no circumstances should KPMG have issued unqualified opinions on the Fund's financial statements, or claimed its audits were performed in accordance with GAAS. By doing so, KPMG acted improperly, negligently and was reckless.

98.    Although KPMG failed to perform its audits of the Fund in accordance with GAAS, it nevertheless sent to the Fund and to Plaintiff unqualified audit opinions with respect to the financial statements of the Fund.

99.    KPMG sent to Plaintiff audit reports on the Fund's financial statements. In each of its audit reports sent to Plaintiff, KPMG stated that it conducted its audits in accordance with GAAS, and expressed its unqualified opinion that the Fund's financial statements "present fairly, in all material respects, the financial position of the [fund] ... and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States."

888197.8

100.    Because KPMG violated GAAS in the face of known dangers arising from the concentration of functions at Madoff Securities and the unreliability of F&H's purported audit work, it was negligent and reckless for KPMG to send to Plaintiff unqualified audit opinions on the Fund's financial statements.

### *Plaintiff Justifiably Relied on KPMG's Audit Opinions to Their Detriment*

101.    KPMG knew that Plaintiff would rely on the audit opinions it sent to Plaintiff concerning the Fund's financial statements. Plaintiff also relied on the representation in the PPM that KPMG would conduct an independent audit of the Fund.

102.    The Plaintiff reasonably and justifiably relied on KPMG's audit opinions in deciding to buy and retain partnership interests/shares in the Fund.

103.    The Plaintiff was damaged by KPMG's wrongful and negligent conduct in that it caused Plaintiff to purchase and retain partnership interests in the Fund that were worthless, and also caused Plaintiff to lose all of its investment in the Fund when the Fund collapsed.

### FIRST CLAIM FOR RELIEF
### (By the Plaintiff against Tremont Defendants for Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder)

104.    Plaintiff repeats the allegations of paragraphs 1 through 103 as if set forth in their entirety herein.

105.    The Tremont Defendants negligently and/or recklessly made or approved deceptive and materially false and misleading statements to the Plaintiff, including in offering materials, DDQs, financial disclosures, and direct conversations, that are attributable to the Tremont Defendants as particularized above.

30                                        888197.8

106.    These false and misleading statements misrepresented that the Tremont Defendants had conducted due diligence on Madoff and Madoff Securities, were familiar with Madoff's and Madoff Securities' operations, and were monitoring Madoff's and Madoff Securities' transactions, internal controls, and operational risk; that the assets purportedly managed by Madoff and Madoff Securities on behalf of the Fund existed and were appreciating; and that the trades Madoff and Madoff Securities purported to be making on behalf of the Fund occurred.

107.    In fact, the Tremont Defendants negligently and/or recklessly ignored that Madoff and Madoff Securities were engaging in a massive Ponzi scheme; that they had not conducted due diligence on Madoff and Madoff Securities, were not familiar with Madoff's and Madoff Securities' operations, and were not monitoring Madoff's and Madoff Securities' transactions, internal controls, and operational risk; that the assets purportedly managed by Madoff and Madoff Securities on behalf of the Fund did not exist; and that the trades Madoff and Madoff Securities purported to be making on behalf of the Fund had not occurred.

108.    If the Tremont Defendants had conducted due diligence on Madoff and Madoff Securities, were familiar with Madoff's and Madoff Securities' operations, and were monitoring Madoff's and Madoff Securities' transactions, internal controls, and operational risk as they represented, it would have been so obvious to the Tremont Defendants that the assets did not exist and the trades had not occurred that they would have been aware of these facts.

109.    The Tremont Defendants knew and intended that the Plaintiff would rely on their representations in purchasing partnership interests in the Fund.

888197.8

110.    The Plaintiff reasonably and justifiably relied on the Tremont Defendant's statements and omissions in purchasing a partnership interest in the Fund. The Plaintiff would not have bought or retained the partnership interest in the Fund if it had been aware that the Tremont Defendants had not conducted due diligence on Madoff and Madoff Securities, and were not monitoring Madoff's and Madoff Securities' transactions, internal controls, and operational risk; or that the assets purportedly managed by Madoff and Madoff Securities on behalf of the Fund did not exist; or that the trades Madoff and Madoff Securities purported to be making on behalf of the Fund had not occurred.

111.    The Tremont Defendants, by their use of the means or instrumentalities of interstate commerce and/or the mails have, thus, violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

112.    Plaintiff has been damaged by the wrongful conduct of the Tremont Defendants in that it caused Plaintiff to purchase and/or retain a partnership interest in the Fund that was worthless.

113.    By reason of the foregoing, Plaintiff is entitled to judgment awarding damages to it against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

114.    In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to it against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

888197.8

## SECOND CLAIM FOR RELIEF
### (By the Plaintiff against Oppenheimer Acquisition
for Violation of Section 20(a) of the Securities Exchange Act of 1934)

115.    Plaintiff repeats the allegations of paragraphs 1 through 114 as if set forth in their entirety herein.

116.    As alleged more fully above, the Tremont Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

117.    At all relevant times, Oppenheimer Acquisition had the power, both direct and indirect, to control the Tremont Defendants, and it did, in fact, exercise such control:

      (i)     Tremont Group Holdings, Inc. was 100% owned by Oppenheimer Acquisition;

      (ii)    Oppenheimer Acquisition provided extensive support services to the Tremont Defendants, including compliance, audit, finance, and human resources;

      (iii)   Oppenheimer Acquisition directed the Tremont Defendants to change its auditors from Ernst & Young to KPMG, which Oppenheimer Acquisition engaged for its subsidiaries' audit work; and

      (iv)   Oppenheimer Acquisition placed John V. Murphy –President and Director of Oppenheimer Acquisition since July 2001, Chairman, Chief Executive Officer, and Director of OppenheimerFunds since June 2001, and President of OppenheimerFunds from September 2000 through February 2007 – on the Board of Directors of Tremont Group Holdings, Inc. (f/k/a Tremont Capital Management) in November 2001.

118.    As a result of Oppenheimer Acquisition's control over the Tremont Defendants, Oppenheimer Acquisition was a controlling person within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

119.    By reason of the foregoing, Plaintiff is entitled to judgment awarding damages to Plaintiff against Oppenheimer Acquisition in an amount to be determined at the trial of this action, but no less than the entire consideration paid by Plaintiff for its interest in the Fund, net of

888197.8

any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

120.    In the alternative, Plaintiff is entitled to judgment awarding compensatory damages to Plaintiff against Oppenheimer Acquisition in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

### THIRD CLAIM FOR RELIEF
**(By the Plaintiff against the Tremont Defendants**
**for Violation of Louisiana Securities Laws)**

121.    Plaintiff repeats the allegations of paragraphs 1 through 120 as if set forth in their entirety herein.

122.    The Tremont Defendants have sold securities to Plaintiff in violation of Louisiana Revised Statute 51:701, et seq.

123.    The Tremont Defendants offered to sell, and sold, a limited partnership interest in the Fund to Plaintiff by means of untrue statements of material fact and omissions of material fact contained in the Limited Partnership Agreement and the PPM, which the Plaintiff relied upon in making the investment in the Fund.

124.    The Tremont Defendants engaged in a practice, or course of business which operated as a fraud or deceit upon the Plaintiff in connection with the sale and purchase of the investment in the Fund.

125.    The Tremont Defendants made numerous untrue statements regarding their supervision, management and oversight of the Fund and the Investment Advisor - Bernard Madoff/Madoff Securities.    The Tremont Defendants omitted material facts regarding the practices employed by Madoff and Madoff Securities. The Tremont Defendants engaged in a

practice of whereby they completely ignored their fiduciary duties regarding the Fund's assets. The Tremont Defendants continually made false statements to the Plaintiff regarding their level of control of the Fund and their standard of care with respect to the Fund.

126.    The Plaintiff has been damaged by the Tremont Defendants' fraudulent and deceitful practices associated with the sale of the interest in the Fund, in that those practices caused the Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

127.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding damages suffered as a result of the Tremont defendants violation of the Louisiana securities laws, against the Tremont Defendants, jointly, severally and *in solido,* in an amount to be determined at the trial of this action, but damages shall be no less than the consideration paid for the limited partnership interest with interest thereon from the date of payment down to the date of repayment, less the amount of any income received thereon, together with all taxable court costs and reasonable attorney's fees.

128.    In light of the substantial participation of Tremont Group Holdings and Tremont Partners in the Fund's management, the representations made in the Fund's offering materials are attributable to each of these defendants.

### FOURTH CLAIM FOR RELIEF
**(By the Plaintiff against the Tremont Defendants for Breach of Fiduciary Duty)**

129.    Plaintiff repeats the allegations of paragraphs 1 through 128 as if set forth in their entirety herein.

130.    As the general partner to the Fund (Tremont Partners), and the entity of which RIM was a division (Tremont Group Holdings, Inc.), respectively, the Tremont Defendants owed

the Plaintiff the fiduciary duty to use reasonable care, or the competence or skill of a professional investment advisor, in managing and overseeing the Plaintiffs' assets that were invested with the Fund.

131.    The Tremont Defendants entrusted management and custody of the Plaintiff's assets to Madoff and Madoff Securities, but retained a fiduciary responsibility to ensure that the Plaintiff's assets were being managed as represented by Madoff and Madoff Securities, and with reasonable care, or the competence or skill of a professional investment advisor.

132.    The Tremont Defendants breached the fiduciary duties they owed to the Plaintiff, and acted negligently and in utter disregard for due care and reasonable and prudent investment standards, by failing to use reasonable care, or the competence or skill of a professional investment advisor, in performing due diligence, managing Plaintiff's investments, providing accurate financial disclosures, and overseeing Madoff's and Madoff Securities' management of the Plaintiff's assets.

133.    The Tremont Defendants' failure to use reasonable care, or the competence or skill of a professional investment advisor, to verify that the Plaintiff's assets were being managed as represented by Madoff and Madoff Securities, enabled Madoff and Madoff Securities to perpetrate and continue their fraudulent scheme by convincing the Plaintiff to invest in, and remain invested in, the Fund.

134.    As a result of the Tremont Defendants' breach of their fiduciary duties, Madoff and Madoff Securities misappropriated the assets they purportedly managed for the Fund as part of a massive Ponzi scheme.

888197.8

135.    The Plaintiff has been damaged by the wrongful conduct of the Tremont Defendants in that such wrongful conduct caused the Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

136.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding rescissory damages to them against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

137.    In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to it against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

### FIFTH CLAIM FOR RELIEF
**(By the Plaintiff against the Tremont Defendants for Negligence and Reckless Disregard)**

138.    Plaintiff repeats the allegations of paragraphs 1 through 137 as if set forth in their entirety herein.

139.    As the general partner to the Fund (Tremont Partners), and the entity of which RIM was a division (Tremont Group Holdings, Inc.), respectively, the Tremont Defendants owed the Plaintiff the duty to use reasonable care, or the competence or skill of a professional investment advisor in managing and overseeing the Plaintiff's assets that were invested with the Fund.

140.    The Tremont Defendants failed to exercise reasonable care by negligently misrepresenting material information concerning the investment and by recklessly disregarding

37                                    888197.8

their duty and obligation to manage and oversee the management by Madoff and Madoff Securities of the Plaintiff's investments in the Fund.

141.    The Tremont Defendants' failure to exercise reasonable care enabled Madoff and Madoff Securities to initiate, perpetrate and continue their fraudulent scheme by convincing the Plaintiff to invest in, and remain invested in, the Fund. The Tremont Defendants negligently and recklessly disregarded their obligations as general partner and Fund manager.

142.    The Plaintiff has been damaged by the Tremont Defendants' failure to exercise reasonable care and the Tremont Defendants' reckless disregard for the duty of care in that this failure and reckless disregard caused the Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

143.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding rescissory damages to it against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

144.    In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to it against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

## SIXTH CLAIM FOR RELIEF
### (By the Plaintiff against the Tremont Defendants and Oppenheimer Acquisition Corporation for Unfair Trade Practices)

145.    Plaintiff repeats the allegations of paragraphs 1 through 144 as if set forth in their entirety herein.

888197.8

146.    The Tremont Defendants have employed unfair and deceptive acts and practices in connection with the solicitation of Plaintiff's investment in the Fund in violation of Louisiana Revised Statute 51:1401, et seq.

147.    The Tremont Defendants made numerous statements in the PPM, the Limited Partnership Agreement and other documentation regarding their level of investigation, due diligence, oversight and supervision of the management of the Fund assets by Madoff and Madoff Securities. Despite their representations to the contrary, the Tremont Partners failed to review the Fund's holdings with Madoff and/or Madoff Securities, failed to competently manage the day-to-day operations of the Fund, failed to properly monitor the activities of Madoff and/or Madoff Securities and failed to review the confirmations of the Fund's trading activity.

148.    The Tremont Defendants participated and assisted in this deceptive strategy of promising conscientious and thorough supervision and management of the Fund while completely ignoring those obligations once Plaintiff's investment was made.

149.    The Plaintiff has been damaged by the Tremont Defendants' deceptive and unfair practice in that their unfair and deceptive practices caused the Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

150.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding three times the actual damages sustained by Plaintiff plus reasonable attorney fees and costs, against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but damages shall be no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

888197.8

151.    In light of the substantial participation of the Tremont Defendants in the Fund's management, the representations made in the Fund's offering materials are attributable to each of these defendants.

## SEVENTH CLAIM FOR RELIEF
### (By the Plaintiff against the Tremont Defendants and KPMG for Detrimental Reliance)

152.    Plaintiff repeats the allegations of paragraphs 1 through 151 as if set forth in their entirety herein.

153.    The Tremont Defendants knew, or should have known, that their representations and promises set forth in the PPM and the Limited Partnership Agreement regarding their supervision and oversight of the Fund would induce Plaintiff to invest its assets in the Fund and to maintain its investment in the Fund.  The PPM provides that "Tremont Partners will review the Partnership's holdings with the Investment Advisor or Investment Advisors not less frequently than quarterly to assess, among other things, their investment performance and to determine whether they continue to meet the general investment criteria outlined above." The Tremont Partners and the Tremont Defendants obviously failed to review the holdings of the partnership or the Ponzi scheme would have been detected.  Further, according to the PPM, Tremont Partners was "responsible for managing the day-to-day operations and investment management of the Partnership" and "has primary responsibility for monitoring the ongoing activities of the Investment Advisor or Investment Advisors. [Tremont Partners] reviews the confirmation of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts." Tremont Partners and the Tremont Defendants failed to manage the day-to-day operations of the Fund, failed to properly monitor the activities of the Investment Advisor and failed to review the confirmation of the Fund's trading activity.

40

888197.8

154.    Plaintiff reasonably and justifiably relied on the representations and promises of the Tremont Defendants when making its investment.  To the substantial economic detriment of Plaintiff, it chose to make the investment in the Fund based on the Tremont Defendants' statements.

155.    The Tremont Defendants are liable to Plaintiff for all damages suffered as a result of Plaintiff's reliance on the Tremont Defendants' promises pursuant to Louisiana Civil Code Article 1967, which provides that a party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.

156.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding damages suffered as a result of the Plaintiff's reliance on the promises by the Tremont Defendants, against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but not less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

157.    In light of the substantial participation of Tremont Group Holdings and Tremont Partners in the Fund's management, the representations made in the Fund's offering materials are attributable to each of these defendants.

158.    Plaintiff also relied, to its detriment, on the representation that KPMG would act as a competent independent auditor of the Fund. In fact, KMPG did act as an independent auditor but was negligent in performing its duties as stated above.

888197.8

## EIGHTH CLAIM FOR RELIEF
### (By the Plaintiff against the Tremont Defendants for Breach of Contract)

159.    Plaintiff repeats the allegations of paragraphs 1 through 158 as if set forth in their entirety herein.

160.    The Limited Partnership Agreement empowered Tremont Partners to carry out the investment objective and the business of the Partnership and required Tremont Partners to "devote such time as it shall determine to be necessary for the efficient conduct of the Partnership's business." Tremont Partners and the Tremont Defendants did not devote the time necessary to efficiently conduct the Partnership's business as the Fund lost all of its assets, including the Plaintiff's investment.

161.    The PPM provides that "Tremont Partners will review the Partnership's holdings with the Investment Advisor or Investment Advisors not less frequently than quarterly to assess, among other things, their investment performance and to determine whether they continue to meet the general investment criteria outlined above."

162.    Further, according to the PPM, Tremont Partners was "responsible for managing the day-to-day operations and investment management of the Partnership" and "has primary responsibility for monitoring the ongoing activities of the Investment Advisor or Investment Advisors. [Tremont Partners] reviews the confirmation of the Partnership's trading activity for purposes of tracking the current status of the Partnership's accounts."

163.    The Tremont Defendants failed to uphold their contractual obligations as set forth in the PPM and the Limited Partnership Agreement. Specifically, the Tremont Defendants failed to manage the day-to-day operations of the Fund, failed to properly monitor the activities of the Investment Advisor and failed to review the confirmation of the Fund's trading activity.

888197.8

164. The Plaintiff has been damaged by the Tremont Defendants' breach of their contractual obligations in that the obligations stated in the PPM and Limited Partnership Agreement caused the Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

165. By reason of the foregoing, the Plaintiff is entitled to judgment awarding damages suffered as a result of the Tremont Defendants breach of their contractual obligations, against the Tremont Defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but damages shall be no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

166. In light of the substantial participation of Tremont Group Holdings, Inc. and Tremont Partners in the Fund's management, the representations made in the Fund's offering materials are attributable to each of these defendants.

## NINTH CLAIM FOR RELIEF
### (By the Plaintiff against the Oppenheimer Acquisition for Negligence)

167. Plaintiff repeats the allegations of paragraphs 1 through 166 as if set forth in its entirety herein.

168. Oppenheimer Acquisition's failure to exercise reasonable care enabled Madoff and Madoff Securities to perpetrate and continue their fraudulent scheme by convincing the Plaintiff to invest in, and remain invested in, the Fund.

169. The Plaintiff has been damaged by the Oppenheimer Acquisition's failure to exercise reasonable care in that this failure caused Plaintiff to purchase and/or hold an interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

43

888197.8

170.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding damages to it against Oppenheimer Acquisition in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund.

171.    In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to it against each of the Tremont Defendants and Oppenheimer Acquisition, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

### TENTH CLAIM FOR RELIEF
**(By the Plaintiff against KPMG for Violations of Section 10(b) of
the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)**

172.    Plaintiff repeats the allegations of paragraphs 1 through 171 as if set forth in their entirety herein.

173.    KPMG issued to the Fund and to the Plaintiff audit reports in which it made materially false and misleading representations that it had conducted the audits of the Fund's financial statements in accordance with GAAS, when in fact KPMG did not conduct these audits in the manner represented. Instead, KPMG negligently or recklessly failed to obtain sufficient appropriate evidence that the assets presented in the Fund's financial statements actually existed, or that the trades from which the reported income was derived actually occurred.

174.    The audit reports issued by KPMG were materially false and misleading also in that they falsely represented that the Fund's financial statements presented fairly, in all material respects, the financial positions of the Fund, and the results of its operations, in conformity with generally accepted accounting principles ("GAAP"). In fact, if KPMG had conducted its audits in accordance with GAAS, it would have been obvious to KPMG that the Fund's financial

888197.8

statements had not been prepared in accordance with GAAP, and misstated the existence of investment assets and earnings when those assets and earnings did not exist.

175.    KPMG knew that the Plaintiff would rely on its audit reports and the false and misleading information contained therein, and would be induced by them to purchase and/or retain a partnership interest in the Fund.

176.    The Plaintiff relied upon these misstatements in making investment decisions with respect to the partnership interest in the Fund, which it would not have purchased if it had known that the statements made by KPMG were materially false and misleading.

177.    KPMG, by its use of the means or instrumentalities of interstate commerce and/or the mails, to recklessly employ devices, schemes, and artifices to defraud, make untrue statements of material facts, and engage in acts of fraud and deceit upon the Plaintiff, all in connection with the purchase or sale of a security, violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-thereunder.

178.    The Plaintiff has been damaged by KPMG's wrongful conduct in that it caused the Plaintiff to purchase and/or retain a partnership interest in the Fund that was worthless.

179.    By reason of the foregoing, the Plaintiff is entitled to judgment awarding rescissory damages to it against KPMG in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

888197.8

180.    In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to the Plaintiff against KPMG in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

181.    To the extent required by applicable law, and in the alternative, Plaintiff alleges all of the claims asserted herein against KPMG derivatively on behalf of "The Fund".

## ELEVENTH CLAIM FOR RELIEF
### (By the Plaintiff against KPMG for Negligence)

182.    Plaintiff repeats the allegations of paragraphs 1 through 181 as if set forth in their entirety herein.

183.    As auditors of the Fund, KPMG owed the Plaintiffs the duty to use reasonable care, or the competence or skill of a professional independent auditor, in conducting audits on the Fund, and rendering corresponding audit opinions that were addressed and distributed to the Plaintiffs, in accordance with GAAS. KPMG knew that the Plaintiff would rely upon its audit reports in purchasing and retaining its partnership interest in the Fund.

184.    KPMG failed to exercise reasonable care by negligently and/or grossly negligently failing to conduct audits on the Fund in accordance with GAAS, and by addressing and disseminating to the Plaintiffs unqualified audit opinions that should have been qualified or disclaimed. In the course of this conduct, KPMG failed to inquire into many crucial facts, which, in the exercise of ordinary care, they should not have ignored and should have investigated. KPMG demonstrated a complete disregard for the rights of the Plaintiff, as well as for the security of its investment.

888197.8

185.  KPMG's negligence and/or gross negligence enabled Madoff and Madoff Securities to perpetrate and continue their fraudulent scheme by convincing the Plaintiff to invest in, and remain invested in, the Fund.

186.  The Plaintiff has been damaged by KPMG's failure to exercise reasonable care in that such failure caused Plaintiff to purchase and/or hold a partnership interest in the Fund that was worthless, causing Plaintiff to lose all of its investment.

187.  By reason of the foregoing, the Plaintiff is entitled to judgment awarding rescissory damages to the Plaintiff against KPMG in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund, together with interest at the maximum rate allowable.

188.  In the alternative, the Plaintiff is entitled to judgment awarding compensatory damages to the Plaintiff against KPMG in an amount to be determined at the trial of this action, together with interest at the maximum rate allowable.

189.  To the extent required by applicable law, and in the alternative, Plaintiff alleges all of the claims asserted herein against KPMG derivatively on behalf of "The Fund".

**WHEREFORE, Plaintiff prays for judgment awarding:**

(a)  Damages against each of the defendants, jointly, severally and *in solido*, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by the Plaintiff for its interest in the Fund, net of any redemption proceeds received from the Fund;

47

888197.8

(b)     In the alternative, compensatory damages against each of the defendants, jointly, severally and *in solido*, in amounts to be determined at trial, but no less than amounts that would reasonably have been earned on plaintiff's investment elsewhere;

(c)     Interest on any award at the maximum allowable rate;

(d)     Plaintiff's costs and disbursements in this action, including, to the extent applicable, attorneys' fees; and

(e)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

RESPECTFULLY SUBMITTED,

**BREAZEALE, SACHSE & WILSON, L.L.P.**
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Fax: 225-381-8029

*/s/ Claude F. Reynaud, Jr.*
Van R. Mayhall, Jr. (#9183)
Claude F. Reynaud, Jr. (#11197)
Van R. Mayhall, III (#27567)
Eric B. Landry (#30587)

*Attorneys for Municipal Employees Retirement System of Louisiana*

48                                                  883197.8